# CASE NO.  14-1238

_____

IN THE

## UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

John Keith Blakely, Rhonda L. Blakely
The Estate of John E. Long and The Estate of
Virginia E. Long,

*Plaintiffs-Appellants*

**v.**

Jacob E. Lew, Secretary of the U.S. Department
of Treasury, and the Commissioner of the U.S.
Internal Revenue Service in their official capacities,

*Defendants-Appellants*

On Appeal from the United States District Court
for the Southern District of New York
New York County Division
Civil Action No.   1:13-cv-02140-JMF

_____

APPELLANTS' BRIEF

_____

Jeffrey M. Blum, Esq.
Counsel for Appellants
1 Stuyvesant Oval 8D
New York, New York 10009
Phone (502) 494-2889

# TABLE OF CONTENTS

JURISDICTIONAL  STATEMENT.................................................................1

ISSUES PRESENTED FOR REVIEW...................................................2

**STATEMENT OF THE CASE**

Historical Background of Plaintiffs' Claims....................................4

Events in Washington D.C. and New York City Directly Giving
Rise to Plaintiffs' Claims..............................................................10

Procedural History in the District Court Below............................22

**SUMMARY  OF  ARGUMENT**.......................................................25

**ARGUMENT**

**Standard of Review**...........................................................27

I.     The District Court Erred in Dismissing the Action for Improper
       Venue Because the Mandamus and Venue Act of 1962 and the
       Judicial Improvements Act of 1990 Dictate that Venue Is Proper
       in the Southern District of New York from which Plaintiffs'
       Underlying Tax Refund Claims Were Filed and to Which the IRS
       Commissioner Communicated His Unequivocal Refusal to Credit
       Their Tendered Assets as Tax Payments.......................................28

       A.     Venue is Proper in the Southern District of New York as well
              as the District of Columbia Because the Mandamus and Venue
              Act of 1962 Directs Federal District Courts to Place Primary
              Emphasis on the Convenience of Plaintiffs Filing Mandamus
              Lawsuits Against Federal Officials in Their Official Capacities.........30

       B.     The District Court Erred in Concluding that Venue Was

More Proper in the Eastern District of Michigan than in
the Southern District of New York for Three Reasons........................33

    1.    The District Court's Reasoning that 28 U.S.C. 1391(e)
        Favored Venue in Eastern Michigan Because Their Claim
        Ostensibly Arose There in 1992 Appears to be Based
        on the Court's Failure to Understand that Since 1990
        Federal Courts No Longer Base Decisions about Venue
        on "Where the Claim Arose."......................................................33

    2.    The District Court Erred Because the Direct Antecedents
        of Plaintiffs' Claim Occurred Entirely in Washington D.C.
        and New York City rather than Flint, Michigan, and
        Controlling Second Circuit Precedents Direct that Decisions
        about Venue Should Be Based on Direct Antecedents, not
        Indirect, Historically Remote Ones............................................37

    3.    There Do Not Remain Any Contested Legal Issues About
        the September 25, 1992 Consent Judgment of Forfeiture
        and Neither IRS Personnel nor Assistant United States Attorneys
        in Eastern Michigan Want to Have Anything
        Further to Do with the Litigation of Plaintiffs' Claims.............41

II.    In Light of the Extensive Delays and Recurring Abuse of the Court
      System Exhibited in this Now Twenty Year-Old Dispute, the Court
      of Appeals Should Exercise Its Discretion to Discourage Official
      Flouting of the Law and Bring the Matter to a Lawful Resolution..............43

Conclusion...........................................................48

Certificate of Compliance pursuant to Rule 32(a)(7)(C).........................................49

# TABLE OF CITATIONS AND AUTHORITIES

<u>Case Law</u>

*Amerio Contact Plate Freezers v. Knowles,* 274 F.2d 590 (D.C. Cir. 1960)...........46

*Bates v. C & S Adjusters, Inc.*, 980 F.2d 865 (2d Cir. 1992).......................36, 40-41

*Birnbaum v. Blum*, 546 F. Supp. 1363 (S.D.N.Y. 1982)..............................33-34, 35

*Blakely v. United States,* 276 F.3d 853 (6th Cir. 2002)............................................10

*Ciena Corp. v. Jarrard*, 203 F.3d 312 (4th Cir. 2000)............................................35

*Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291 (3d Cir. 1994)..............35

*Daniel v. Am. Bd. Of Emergency Med.*, 428 F.3d 408 (2d Cir. 2005)......3, 34, 40-41

*Gulf Insurance Company v. Glasbrenner*, 417 F.3d 353 (2d Cir. 2005)......27-28, 36

*Jenkins Brick Co. v. Bremer*, 321 F.3d 1366 (11th Cir. 2003)....................35, 40-41

*Leroy v. Great W United Corp.*, 443 U.S. 173 (1979)............................................32

*Libretti v. United States*, 516 U.S. 29 (1995).......................................................13-14

*Mitrano v. Hawes*, 377 F.3d 402 (4th Cir. 2004)................................................34-37

*O'Neal v. Hicks Brokerage Co.*, 537 F.2d 1266 (4th Cir. 1976).............................46

*Orion Shipping & Trading Co. v.United States*, 247 F.2d 755 (9th Cir. 1957)........46

*Phillips v. Active Audio Ltd.*, 494 F.3d 378 (2d Cir. 2007).....................................28

*Pruess v. Udall*, 359 F.2d 615 (D.C. Cir.1965).......................................................31

*Ratzlaf v. United States,* 535 U.S. 135 (1994)..................................................9, 12-13

*Stafford v. Briggs*, 444 U.S. 527 (1980)...................................................................31

*Uffner v.La Reunion Francaise, S. A.,* 244 F.3d 38 (1st Cir. 2001)....................35-36

*United States v. Kales*, 314 U.S. 186 (1941)............................................................10

<u>Other Authorities</u>

26 U.S.C. § 7422(a)...................................................................................................44

 28 U.S.C. § 1291........................................................................................................1

28 U.S.C. § 1361.........................................................................................................1

28 U.S.C.A. § 1391(a)...............................................................................................35

28 U.S.C. § 1391(b)(2)..........................................................2, 25, 31, 32, 36, 40-41

28 U.S.C. § 1391(e)................................................................27, 30-31, 33, 45, 48

28 U.S.C. § 1406(a)........................................................................................23, 25, 46

31 U.S.C. § 5324(a)(3)...................................................................................5, 8, 15

Judicial Improvements Act of 1990, Pub. L. No. 101-650,
§ 311(1), 104 Stat. 5089........................................................................34-36, 48
Mandamus and Venue Act of 1962.......................................................2, 25, 31, 48

Senate Report No. 1992, 87th Cong., 2d Sess. 3 (1962)........................................31

31 CFR § 103.22...........................................................................................................9

31 CFR § 103.63...........................................................................................................9

Rule 4(a)(4)(A)(vi), Fed. R. App. Proc .....................................................................1

Rule 4(a)(1)(A), Fed. R. App. Proc..............................................................................1

Rule 12(b)(3), Fed. R. Civ. Proc...........................................................2, 23, 27, 48

Rule 60(b)(1), Fed. R. Civ. Proc.......................................................................1, 47

Rep. of the Fed. Cts. Study Comm. 94 (Comm. Print 1990))................................35

David D. Siegel, "Commentary on the 1988 and 1990 Revisions of
Section 1391, Subdivision (a), Clause (2)," printed in 28 U.S.C.A. § 1391
(West 1993) ........................................................................................................36

# JURISDICTIONAL  STATEMENT

This is a direct appeal from two final decisions of the United States District Court for the Southern District of New York.  The Hon. Jesse M. Furman issued a Memorandum Opinion and Order dismissing the action in its entirety on the sole ground of improper venue on December 30, 2013 (Dkt. 35), and the clerk's final judgment of dismissal was entered the next day.  (Dkt. 36).  Plaintiffs moved to set aside the judgment pursuant to Rule 60(b)(1), Fed. R. Civ. Proc., on January 27, 2014 (Dkt. 37), which was denied without opinion on March 20, 2014 (Dkt. 43). A timely notice of appeal was filed on April 17, 2014 (Dkt. 44) establishing appellate jurisdiction pursuant to Rules 4(a)(4)(A)(vi) and 4(a)(1)(A), Fed. R. App. Proc., and 28 U.S.C. § 1291.

Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1361 which states that "the district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."  Plaintiffs herein have sued Treasury Secretary Jacob Lew and the current Commissioner of the Internal Revenue Service (IRS) in their official capacities to compel them to credit Plaintiffs' tendered assets as tax payments, rule on their long-pending tax refund claims and disclose the results of a review conducted by IRS Division Counsel

Martin Needle with respect to Plaintiffs' entitlement to refunds.  Plaintiffs contend

that each of these is a mandatory duty that Defendants owe to Plaintiffs and have

unequivocally refused to perform.

## ISSUES PRESENTED FOR REVIEW

The central question presented by the district court's dismissal for improper

venue pursuant to Rule 12(b)(3), Fed. R. Civ. Proc., is whether the activities of

Plaintiffs' counsel in the Southern District of New York preparing Plaintiffs' tax

refund claims and communicating with IRS leadership in Washington D.C. about

their refusal to credit assets as tax payments and rule on pending refund claims are

"too tenuous" a connection with the district to provide a basis for venue in it.

Underlying this question are three subsidiary ones.  The first is whether the

Mandamus and Venue Act of 1962, which intends that the convenience and cost-

savings of Plaintiffs be primary concerns affecting venue in mandamus lawsuits

against federal officers in their official capacities, and the 1990 amendments

establishing that venue under 28 U.S.C. § 1391(b)(2) can be proper in more than

one location and need not be "where the claim arose," together direct that

substantiality of events or omissions be liberally construed when Plaintiffs have

legitimate economic reasons for favoring the forum in which their counsel resides

and has worked on the case.

The second subsidiary question is whether the district court erred in emphasizing the substantiality of an indirect, historically remote antecedent of events giving rise to Plaintiffs' claim while downplaying the significance of seemingly less substantial events that are directly connected with and integral to the acts immediately giving rise to the claim (i.e., the communications between Plaintiff's counsel and the Commissioner's representative in which the unequivocal refusal to perform the mandatory duty without formal litigation). This question tests the limits of dicta in *Daniel v. Am. Bd. Of Emergency Med.*, 428 F.3d 408, 432 (2d Cir. 2005), that "[w]hen material acts or omissions within the forum bear a close nexus to the claims, they are properly deemed 'significant' and, thus, substantial . ." 428 F.3d at 433.

The third subsidiary question, which is intertwined with the second, concerns the significance for venue analysis of a historically remote but conceptually related judgment in a United States District Court.   Although not stated this way by Judge Furman or any of the parties, the question seems to be whether judicial action unleashing a sequence of events eventually giving rise to the claim is inherently so substantial that the court in which it occurred can be deemed to be where the eventual claim arose, and its presence in the sequence of events be a basis for a *de facto* return to the type of venue analysis that was

practiced prior to the 1990 amendments.

In addition there is an issue of whether the District Court should have given more serious consideration to Plaintiffs' motion to transfer the case to the District of Columbia. *See* Point II of Argument, *infra*.

## STATEMENT OF THE CASE

Historical Background of Plaintiffs' Claims

During the mid-1980's Appellant Rhonda Blakely and her mother Virginia (Betty) Long created a small family business involved in the exhibition of country folk. Their project, Country Folk Art Shows, Inc. ("Country Folk Art Shows" or "CFAS"), proved suddenly and unexpectedly successful and began making significant amounts of money, largely through acquiring gate receipts of approximately five dollars per person attending the shows. At no time has anyone alleged that any of Country Folk Art Shows' income was unlawfully derived or that any illegal substances had been involved in any aspect of the business. However, the Longs and Blakelys were not prepared to run a successful business and they allowed Betty's husband, John Emmett Long, to do the accounting and tax preparation for the family and its business. John made at least one major error, which consisted of believing that income could be deferred and carried forward if it were being used for major capital expenditures. In their case these consisted of

4

plans for a warehouse and web press because they had begun producing magazines related to country folk art.

Because of John Long's incompetent tax management the Longs and Blakelys quickly accrued a major tax liability in excess of five million dollars which led immediately to both civil deficiency notices and criminal prosecution on charges of income tax evasion and violation of the currency structuring law, 31 U.S.C. § 5324(a)(3). The Longs and Blakelys, who had had no prior history with the criminal justice system, were contrite about their failings and immediately agreed to comply with the United States Attorney's demands. They pleaded guilty to the criminal charges, paid all the assessed fines and settled the issue of their tax liability on terms proposed by the I.R.S. Although the government appears to have overreached in doubling all taxes, interest and penalties based solely on Country Folk Art Shows not having formally acquired recognized status as an "S corporation," the Longs and Blakelys chose to accept and pay this additional loss. By 1995 the entire tax liability had been paid off and there have been no continuing issues with regard to it. Nor has there been any further tax delinquency.

Nevertheless, a serious issue has arisen regarding entitlement to tax refunds, which eventually came to involve Attorney General Ashcroft and Deputy Attorney General Comey in trying to get the I.R.S. leadership to comply with limitations

5

imposed by the Internal Revenue Code. These limitations consist entirely of the following: when a taxpayer has been served with deficiency notices and attempts to cure them by tendering mostly liquid assets to the I.R.S., the Service is required to credit the payments as tax payments. It cannot, as has been done in this case, distribute the assets as gifts or grants to its agents and then use its own mishandling of funds as justification for assessing the same taxes, interest and penalties a second time.

After identifying the Longs' and Blakelys' tax deficiencies the I.R.S. collected monies due in two stages. The first was a consent judgment of forfeiture entered into on September 25, 1992. During the years 1988-1991 Plaintiffs had accrued a tax liability of approximately $5.3 million, including interest and penalties. CFAS had recently and unexpectedly become a successful enterprise and at that time was operating without substantial oversight from a Certified Public Accountant. John Long and other family owners of the CFAS were attempting to offset receipts against the costs of purchasing a warehouse and web press, which took longer than anticipated to obtain. As a result the owners wound up under-reporting income for several years in a row based on John's incorrect belief that it was possible to carry forward income if it were being used for a business purpose. (APX 30-32.)

Once plaintiffs' under-reporting was discovered they cooperated fully with the United States and quickly agreed to pay off the liability for taxes, interest and penalties calculated by the I.R.S., which had been given unimpeded access to all company and personal financial records. (See APX 82-83 for summary of liability and proof that forfeited assets were not credited as tax payments.) A competent, full-time accountant was also hired to handle the company's financial affairs.

The United States, which acknowledged from the outset that all income of CFAS and its owners had been legally derived from conducting exhibitions of country folk art, chose to receive its first installment on the overall liability that exceeded five million dollars, by means of a September 25, 1992 consent judgment of forfeiture ("the consent judgment") (APX 52-57). The consent judgment and its accompanying stipulations (APX 46-51) recited no facts other than that plaintiffs owned and agreed to forfeit several bank accounts, a house and other personal property, all of which were forfeited to the United States. The overall value of this property was calculated to be near four million dollars in the September 29, 1992 Affidavit of I.R.S. Special Agent Gregory R. O'Connor, an amount that has never been disputed. (See APX 64-71).

Plaintiffs' consent to the forfeiture was elicited by telling them that these particular assets could be forfeited because they were involved in "structuring," but

7

that IRS policy required that any legally derived assets forfeited because of currency structuring had to be credited as payments toward tax liability. See Affidavit of J. Long, ¶¶ 9-22. (APX 22-29).   This policy, which had come from a ruling by the then Assistant Commissioner and was published as part of the IRS Litigation Memorandum, was communicated to plaintiffs and used to obtain their consent to making their first installment payment in this manner.  *Id.*, (APX 76-78).  There was no discussion of, and Plaintiffs had no intention of offering, anything in the nature of a gift or bribe to IRS agents.  See Affidavit of J. Long, ¶¶ 9-22, Affidavit of Keith Blakely, ¶¶ 6-23, Declaration of Jeffrey M. Blum, ¶¶ 4-11 (APX 22-29, 32-45).

During the two months after the consent judgment was signed the forfeited proceeds were transferred to the U.S. Department of Justice Assets Forfeiture and Money Laundering Section ("AFMLS"), which then distributed them back to Treasury agents and agencies.  Extremists in AFMLS took the position that because actual currency structuring offenses committed in violation of 31 U.S.C. § 5324(a)(3) could provide an independent basis for forfeiture, the transfer of assets to AFMLS voided any controlling authority for the Assistant Commissioner's directive regarding forfeiture of legally derived assets involved in currency structuring.  IRS officials were persuaded to adopt this approach and the same

taxes, interest and penalties were assessed a second time.  None of the forfeited assets was credited as anything other than a gift and/or forfeiture to the IRS.  (APX 82-83).

When the Supreme Court decided *Ratzlaf v. United States,* 535 U.S. 135, 136 (1994)(clarifying that currency structuring law only prohibits "*break[ing] up a single [currency] transaction* above the [$10,000] reporting threshold into two or more separate transactions for the purpose of evading a financial institution's [CTR] reporting requirement.") (emphasis supplied) Plaintiffs learned that the interpretation of the currency structuring law being propagated by AFMLS extremists was incorrect.  It quickly  became clear that Plaintiffs had not engaged in currency structuring because their repeated deposits of cash from gate receipts tendered by thousands of patrons in small bills did not constitute breaking up of any single transactions as defined in the controlling regulations, 31 CFR §§ 103.22, 103.63.  All currency structuring convictions were then vacated by the original trial judge, the Hon. Stewart A. Newblatt, by an August 21, 1997 opinion that was formalized into a September 5, 1997 Order (APX 58-61).

In the wake of that decision Plaintiffs began seeking the return of forfeited assets and/or refund for overpayment of taxes through a variety of legal avenues. The timeliness of a tax refund lawsuit had been established by hand delivery of a

54-page refund demand letter on August 17,1994 (APX 41) within two years of both the Consent Judgement of Forfeiture and the ensuing imposition of the same taxes, interest and penalties a second time, which easily satisfied the requirements of an informal refund claim under the doctrine of *United States v. Kales*, 314 U.S. 186, 194 (1941) (informal claim must have "a written component," communicate that a refund is being sought and "furnish sufficient information to 'allow the IRS to make a reasonable and intelligent investigation and evaluation of the taxpayer's claim.'") (See APX 72-75, 91-96).

On January 11, 2002 the United States Court of Appeals for the Sixth Circuit issued its published opinion in *Blakely v. United States,* 276 F.3d 853 (6th Cir. 2002)*.* The Sixth Circuit determined that Plaintiffs should obtain repayment through the vehicle of tax refunds instead of other conceivable avenues. The Court of Appeals also ruled that Plaintiffs' 54-page refund demand letter was insufficient to invoke the jurisdiction of federal courts to order a tax refund, but that it would establish the timeliness of the claims once properly amended refund claims were filed. *See* footnote 9 of opinion. (APX 72-75, 91-96).

Events in Washington D.C. and New York City Directly Giving Rise to Plaintiffs' Claims

This action seeks a writ of mandamus against the Commissioner of the

10

Internal Revenue Service and Secretary of the Treasury directing them to (a) credit approximately four million dollars in assets tendered to the IRS to pay off a tax liability as tax payments instead of treating them as gifts or grants to Treasury agents and agencies, (b) to acknowledge receipt of, and deliver to appropriate persons in the IRS for consideration, Plaintiffs' eighty-page amended refund claims that have been filed repeatedly since April 2, 2002 but have twice been declared "lost or misplaced," and (c) to divulge the contents of a formal review conducted by Associate IRS Division Counsel Martin Needle at the request of the Deputy Attorney General of the United States regarding IRS obligations to pay the refund claims.

All actions taken by the government giving rise to these claims have been undertaken in Washington D.C. without involvement of any I.R.S. or Department of Justice personnel in the Eastern District of Michigan.  Defendants' unequivocal refusal to perform their mandatory duty of crediting Plaintiffs' assets as tax payments was never communicated to Plaintiffs in either Michigan or Florida where they principally reside, but was conveyed to their attorney in New York City, which was also the situs from which the amended tax refund claims were largely prepared.  Although the Consent Judgment of Forfeiture entered in Flint, Michigan on September 25, 1992 was at one point in time essential for unleashing

the sequence of events that eventually gave rise to Plaintiffs' claims in this lawsuit, that judgment is neither at issue in the instant case nor was it a tortious event giving rise to Plaintiffs' claims in this case.

Despite protracted litigation over the period of 1994-2008 there remain no unresolved issues regarding the September 25, 1992 Consent Judgment of Forfeiture.  The consent judgment and its accompanying stipulations did not explicitly recite that the  assets would be credited toward tax liability as the owners had been told they would, but it mentioned "structuring" and was accompanied at the time by an Assistant Commissioner's policy directive and IRS Litigation Guideline Memorandum, both stating that currency structuring forfeitures would only be authorized to pay off tax liability if the assets had been lawfully derived. (APX 76-78).   When AFMLS persuaded the IRS to defy its regulations and try to keep the forfeited assets by claiming that violations of the anti-structuring law, 31 U.S.C. § 5324(a)(3), this led to repeated efforts to try to set aside the judgment of forfeiture because the government could not identify any actual violations of § 5324(a)(3), which prohibits only the breaking up of single transactions as defined by the statute.  The government was able to make arguments about "structuring" in the abstract (which is not illegal), but could not identify any single transactions that had been broken up.  *See Ratzlaf v. United States,* 535 U.S. 135, 136

12

(1994)(clarifying that currency structuring law only prohibits "*break[ing] up a single [currency] transaction* above the [$10,000] reporting threshold into two or more separate transactions for the purpose of evading a financial institution's [CTR] reporting requirement.") (Emphasis supplied.)   Despite extensive legal wrangling during the period of 1999-2003, which appears unnecessary in retrospect, by 2008, four years after the Deputy Attorney General had intervened, the United States was conceding that the only discernible basis for the forfeiture had been the CFAS Owners' tax liability.  On August 6, 2008 in response to a motion to supplement the record on appeal a panel of three Sixth Circuit judges ruled that Plaintiffs:

> now move to supplement the record on appeal by requiring the government to file with the court a list of structured transactions.  No such list was filed in the district court, and that court did not consider a list of structured transactions in ruling on the appellants' motion to vacate.  The government opposes the motion to supplement the record. . .  As noted by the court in denying appellants' motion for a limited remand, a list of structured transactions will not assist the court in its consideration of the issue on appeal.

(APX 88-89).  If the factual basis of the forfeiture had been structured transactions rather than payment of tax liability, then a list of structured transactions would have been absolutely essential for "consideration of the issue on appeal" due to an absolute rule that consent judgments of forfeiture having no factual basis are void and must be set aside.  *See Libretti v. United States*, 516 U.S. 29, 42-44, 55-56

13

(1995) (unanimously affirming absolute need for factual basis set forth by statute and declaring judgments of forfeiture without statutory basis to be void).

By 2009 the September 25, 1992 Consent Judgment of Forfeiture had become a remote antecedent of any ongoing legal issue–remote both in time and in substance because each of the following was no longer contested:

1.  CFAS Owners had agreed to forfeit the assets taken in the Consent Judgment of Forfeiture;

2.  Given their tax liability at the time, the Consent Judgment was legitimate and will not be set aside;

3.  At the time the IRS had in place a policy requiring that forfeitures associated with the concept of "structuring" only be used to pay off tax liability if the forfeited assets had been lawfully derived, which the government conceded at the time was true of all assets acquired by Country Folk Art Shows.  Plaintiffs' consent to the forfeiture was acquired by reassuring them that they would be paying off their tax liability.  *See* Affidavit of John Long dated February 21, 2002, ¶¶ 12-22  (APX 24-29).

4.  The proper and only means for CFAS Owners to obtain redress was through tax refunds.  Although the CFAS Owners' initial attempt to sue for refunds in 2000 was premature because they had not yet submitted any formal refund claim

14

that satisfied the informational requirements for being a valid claim, they would be allowed to amend their prior informal claim and such amended claims would be considered timely.

Thus the current dispute began with CFAS Owners' filing of amended refund claims with the IRS on April 3, 2002.[1]  At that time the undersigned did send a copy of the amended refund claims to IRS Counsel Rob Heitmeyer in Detroit, Michigan.  However, the copy was returned with instructions that it should be delivered instead to the I.R.S. nationally, eventually to be addressed by counsel in Washington D.C.

Initially on March 25, 2002, and again on April 3, 2002, the undersigned, who had been granted Power of Attorney by, and received all necessary signatures from Plaintiffs,  filed with IRS Counsel and the IRS Service Center in Cincinnati, respectively (APX 41) the refund claims contained in the appendix after receiving substantial input from their accountant.  (APX 1-79).  Following a period of

---

[1]  Due to inconsistent positions being taken by different persons within the Justice Department CFAS Owners continued using the forfeiture litigation to try to force an on-the-record acknowledgment that there had been no factual basis for the forfeiture other than the need to pay off tax liability.  By 2009 it was clear that the Owners had lost every battle to get the consent judgment of forfeiture set aside but won the war of getting the government to acknowledge that no additional collection of money had been justified by any alleged violations of 31 U.S.C. §5324(a)(3).

15

inaction on the amended refund claims the undersigned spoke with regional

counsel for the IRS Small Business and Self-Employed Division, Richard

Witkowski, who explained that Plaintiffs could not successfully sue for a tax

refund until the Commissioner of the IRS or some appropriate designee formally

reclassified the retained assets as tendered tax payments.   Witkowski explained

that even if IRS agents appeared and collected money for themselves by pretending

the money was to pay off tax liability, the taxpayers would not be entitled to a

refund for having tendered the money unless an order was written by the

Commissioner directing IRS staff to construe the tender as tax payments. *See* letter

of Deputy Commissioner Kevin M. Brown dated January 16, 2007 confirming that

form 843 titled "Claim for Refund and Request for Abatement" cannot be used to

secure return of forfeited assets absent reclassification letter (APX 87).

    After two years of IRS inaction on the amended refund claims and various

letters to Department of Justice personnel the undersigned counsel received a

telephone call from Counsel to then Attorney General John Ashcroft who

explained that the Deputy Attorney General, acting through one of his Associate

Deputies Attorney General, would conduct a review of the improper forfeiture and

most likely assist in getting the IRS to provide an appropriate refund.  The review

began in the late summer of 2004 and was conducted by Associate Deputy

16

Attorney General Catherine O'Neil, who solicited extensive correspondence and documentation from the undersigned and had repeated telephone conversations with him, most of which centered on the factual question of whether there had been any independent basis for the government to retain assets over and above the amount needed to satisfy Plaintiffs' tax liability.

Associate Deputy Attorney General O'Neil concluded her review on July 25, 2005, shortly before she and Deputy Attorney General Comey left office.  The review generated two similarly worded letters to the undersigned and to IRS Criminal Invesigations Chief, Nancy Jardini.  The letter to Jardini concluded that "in considering this case, this office has been mindful of the fact that the factual basis for the forfeiture appears to be closely linked with the facts underlying the $5.3 million tax liability of the taxpayers. . .  I am writing to suggest that your office undertake its own review of the facts of the pending refund claim and render a decision."  The letter requested that the IRS Criminal Investigations Division have its own counsel review the matter to confirm that there was no independent factual basis for retaining assets over and above the payment of tax liability and that it then "render a decision" on Plaintiffs' pending refund claims. (APX 84-85).

Shortly after July 25, 2005 Deputy Attorney General Comey and  Associate Deputy Attorney General O'Neill followed Attorney General Ashcroft's lead and

17

resigned their positions in the Justice Department.  Since that time the Justice

Department has taken the position that the processing of refund claims is the

responsibility of the IRS and that no further involvement of the Justice Department

is needed.

In response to the July 25 letter Chief Jardini had Associate Division

Counsel Martin Needle prepare a review, which he assured the undersigned would

kept in IRS files until the matter was resolved.  Associate Division Counsel

Needle's review was completed during or about December, 2005; however,

Division Counsel Edward G. ("Ted") Cronin subsequently refused to divulge its

contents, citing attorney-client privilege as the legal ground for the refusal.   Chief

Jardini, whose branch of the IRS had initiated the forfeiture, responded by sending

the attached letter dated December 8, 2005 in which she concluded "that Internal

Revenue Service-Criminal Investigation (CI) does not have jurisdiction regarding

these claims."  (APX 86).  Jardini's response was technically correct in that the

appropriate division of IRS for processing the refund claims was the Small

Business and Self-Employed Division ("SBSE"), not Criminal Investigations.

Nevertheless, the IRS continued diverting all communications regarding the refund

claims to the Criminal Investigations branch and its Division Counsel, despite

Counsel's concurrence that it did not have jurisdiction over the matter.

18

The undersigned's ensuing efforts to communicate with the IRS Commissioner, the Deputy Commissioner and Office of Chief Counsel were time-consuming and generated little progress or contact with relevant decision makers. No response to, or letter of disallowance for, the attached refund claims was ever received. On two occasions lower level IRS personnel conducted searches and reported that the refund claims had never been processed and appeared to have been lost because there was no record of them in IRS computers. The Treasury Inspector General for Tax Administration ("TIGTA") investigated the disappearance of the claims but reported that it had no authority to intervene substantively in the handling of refund claims.

The most illuminating response came from IRS Deputy Commissioner for Services and Enforcement Kevin M. Brown on January 16, 2007. It stated: "The forfeiture action involving John and Virginia Long and John and Rhonda Blakely has been litigated through Federal District Court and the Court of Appeals, and has been decided by them. . . Accordingly, there is no further action to be taken by the Internal Revenue Service." (APX 87). Deputy Commissioner Brown's response revealed a fundamental misunderstanding of the nature of the September 25, 1992 Consent Judgment, which in reality had simply tendered assets to the United States, but recited no findings of fact as to whether the assets were being taken as

19

partial payment of the agreed upon tax liability.

As noted in ¶ 13 of Plaintiffs' amended complaint:

Technically Plaintiffs' tax refund claims did not arise from the
September 25, 1992 consent judgment of forfeiture because that was
only the first of two times that assets were collected to pay off the
same tax liability.  The second collection occurred several months
later not because of any discretionary decisions made by IRS
personnel in Michigan but stemmed from a meeting of IRS counsel
and administrators in Washington D.C. where they decided to impose
the same taxes, interest and penalties a second time.  On information
and belief this decision was hotly disputed among pertinent IRS
personnel because it involved defying the Assistant Commissioner's
directive regarding currency structuring forfeitures of lawfully derived
assets, *see* APX 76-78, and IRS personnel may have known that there
were not even any violations of the actual currency structuring law.

(APX 104)  IRS representations at the time of the consent judgment had left

Plaintiffs with no reason to doubt that the assets would be duly credited.  So the

sudden imposition of double taxation generated two months later came as a shock

and led Plaintiffs to retain the undersigned.

To correct Deputy Commissioner Brown's confusion, which apparently was

leading him to believe that the judgment had authorized retention of forfeited

assets over and above payment of the tax liability, the undersigned initiated an

additional round of litigation in the District Court and Sixth Circuit Court of

Appeals.  The only theory by which the government could claim it was entitled to

retain the assets over and above payment of tax liability involved rejecting the

20

reviews done by Associate Deputy Attorney General O'Neill and Associate

Division Counsel Martin Needle and returning to position advocated by AFMLS

extremists prior to 2004–which was that all assets could be forfeited because all

CFAS cash bank deposits (some of which exceeded $10,000 and many of which

had CTRs filed) were "structured transactions."  This led Plaintiffs to initiate an

additional round of litigation in the district court in Flint seeking either to have the

Consent Judgment of Forfeiture set aside or to have it made explicit on the record

that Plaintiffs' $5.3 million in tax liability, rather than an additional four million

dollar penalty for depositing cash in the bank, was the reason for Plaintiffs' tender

of assets in the September 25, 1992 Consent Judgment.  The district judge, who

had replaced the original trial judge in 1998, but at this point was close to

retirement due to the progression of Alzheimer's disease, refused to do either.

However, on August 6, 2008 the Sixth Circuit Court of Appeals panel obviated any

need to set aside the consent judgment by making clear that the judgment of

forfeiture had not been based on the assets' involvement in structured transactions.

*See* APX 88-89 and pertinent portions of panel's opinion quoted on page 13, *supra.*

Following an additional two years of attempts to reach top I.R.S. leadership

the undersigned was able to establish a type of limited indirect contact with the

Chief Counsel of the IRS.  Such counsel, who apparently communicated with and

21

ostensibly has provided his office's final response through its employee Douglas Hoffmaster (see APX 97), seems to have determined that the IRS would take no action until a mandamus suit were filed against the Commissioner to compel him to acknowledge the forfeited assets as payments that should have been credited toward tax liability.

The undersigned's communications with Hoffmaster, which began in November, 2012 and included the sending of yet another copy of the amended refund claims on November 28, 2012 (APX 97), reached a conclusion during the week of February 18, 2013 when Hoffmaster telephoned and spoke with the undersigned in his New York office.  Mr. Hoffmaster stated that the mandamus action should be filed now and he responded affirmatively to the undersigned's question as to whether the chief counsel has signed off on that decision.

Procedural History in the District Court Below

The instant case was filed in the United States District Court for the Southern District of New York on April 1, 2013 and assigned to the Hon. Jesse M. Furman, district judge.  Magistrate Judge Gabriel W. Gorenstein was also designated, but played no role in the case because it was adjudicated without any kind of hearing, conference or other in-person appearance.  The Court issued a notice of initial pretrial conference on April 19, 2013 (Dkt. 2) which Defendants'

counsel, AUSA Cristine Phillips, requested be adjourned.  The adjournment was granted over Plaintiffs' objections (Dkt. 5, 6) to AUSA Phillips' request that the parties also be excused from filing the required pretrial submissions.  Plaintiffs were hoping to have the Court require Defendants state their position on the merits of their claims.

On June 28, 2013 Defendants moved in lieu of answering the complaint to dismiss the action for improper venue pursuant to Rule 12(b)(3), Fed. R. Civ. Proc., or in the alternative to transfer the case to the Eastern District of Michigan pursuant to 28 U.S.C. § 1406(a).  (Dkt. 7).   On July 1, 2013 the Court *sua sponte* issued an Order requiring that any amended complaint be filed by July 19, 2013. (Dkt. 10).   The July 1 Order directed that "if Plaintiffs do amend, by three (3) weeks after the amended complaint is filed, Defendants shall (1) file an answer; (2) file a new motion to dismiss; or submit a letter to the Court, copying Plaintiffs, stating that they rely on the previously filed motion to dismiss."    On July 18, 2013 Plaintiffs filed an amended complaint, primarily expanding the portions of the complaint that provided information regarding proper venue. (Dkt. 15, APX 98-124).  On August 9, 2013 the Court denied the initial motion to dismiss or transfer as moot (Dkt. 21) and granted leave for it to be renewed or refiled in response to the amended complaint, which Defendants did on the same day (Dkt, 22, 23),

23

making a response due on August 22, 2013.  (On September 9, 2013 Defendants

filed their second motion to dismiss for improper venue and resubmitted their

initial memorandum in support of it.  (Dkt. 30, 31).

Plaintiffs, after having filed their memorandum in opposition to Defendants'

motions on August 22 (Dkt. 25), on August 23 moved to transfer the case to the

District of Columbia contingent on the Court finding improper venue in the

Southern District of New York. (Dkt. 26).   On September 6, 2013 Appellee's

counsel, AUSA Phillips, wrote Judge Furman a letter stating that they would not

respond to Plaintiffs' motion to transfer because a contingent motion was not a

proper motion.  (Dkt. 29).  Plaintiffs resubmitted their motion on September 9,

2013, deleting the word "contingent" from it. (Dkt. 30, 31) The next day Judge

Furman terminated Plaintiffs' motion to transfer the case to the District of

Columbia, advising that no further response from Defendants would be needed.

(Dkt.  32)

On December 30, 2013 Judge Furman issued a memorandum opinion and

order granting Defendants' motion to dismiss for improper venue and denying both

sides' motions to transfer the case to the Eastern District of Michigan and the

District of Columbia, respectively.  (Dkt. 35)  Judgment was entered the next day.

(Dkt. 36). On January 27, 2014 Plaintiffs moved pursuant to Rule 60(b)(1), Fed. R.

24

Civ. Proc., to set aside the judgment and to correct other mistakes in the opinion. (Dkt. 37, 38). After the motion was fully briefed Judge Furman on March 20, 2014 issued a one-page order denying it in its entirety "substantially for the reasons set forth in the Government's memorandum of law in opposition to the motion." (Dkt. 43)  A timely notice of appeal was filed April 17, 2014. (Dkt. 44).

## SUMMARY  OF  ARGUMENT

The district court erred in dismissing this action for improper venue largely for four reasons.  First, it failed to take into account the main statutory purpose of the Mandamus and Venue Act of 1962 that created 28 U.S.C. § 1391(e), which is to facilitate cost savings and convenience for plaintiffs who are in the unenviable position of having to file mandamus lawsuits against federal officials.  Second, the district court incorrectly prioritized remote antecedents of the events directly giving rise to Plaintiffs' claims over the events themselves.  This is contrary to established rules of venue analysis that the Second Circuit Court of Appeals has articulated.  Third, the district court wavered in its application of the 1990 amendments to § 1391 which replaced the traditional analysis determining "where the claim arose" with a more permissive approach that simply requires that a "substantial part of the events or omissions" giving rise to the claim occur within the boundaries of the chosen forum.

25

Finally, the district court erroneously assumed–and then overlooked specific documentary evidence to the contrary, *see* Order quoted on page 13, *supra*–that this case turns on a continuing dispute over the Consent Judgment of Forfeiture entered in Flint, Michigan on September 25, 1992.  The issues of whether that judgment will be set aside and what its factual basis was have long since been settled by the Sixth Circuit Court of Appeals.   There is no longer any question that Plaintiffs did tender the assets that constituted their first payment to the IRS, that the IRS later chose not to recognize the tender as a tax payment, and that although the tender was lawful and will not be set aside, there was never any factual basis for it other than the one communicated to Plaintiffs at the time–namely, that they were paying off most of their $5.3 million liability for taxes, interest and penalties.

Point II of the Argument contends that some additional forms of auxiliary relief should be provided to Plaintiffs.  These include transferring the instant action to the District of Columbia pursuant to 28 U.S.C. § 1406(a) in the event that the Court of Appeals determines that venue was not proper in the Southern District of New York and correcting some factual errors in the district court's opinion that could be a source of consternation and embarrassment in the future.

# ARGUMENT

## Standard of Review

This appeal centers around a single issue of whether the District Court erred when it dismissed the case pursuant to Rule 12(b)(3), Fed. R. Civ. Proc., on the sole ground of improper venue.  Because the dismissal was rendered without holding an evidentiary hearing, Plaintiffs were required to make only a prima facie showing that venue was proper in the Southern District of New York under the applicable statute, 28 U.S.C. § 1391(e).  On appeal Plaintiffs contend that the District Court erred in holding that their attorney's preparation of tax refund claims and communications with IRS national leadership from his New York office, which communicated the leadership's unequivocal refusal to credit Plaintiffs' assets as tax payments, disclose the contents of a review performed by Division Counsel or rule on their long pending refund claims–thereby giving rise to their entitlement to writs of mandamus–was not "a substantial part of the events or omissions giving rise to the claim."  The question of whether Plaintiffs made a sufficient prima facie showing to justify venue in the Southern District of New York raises "a quintessential legal question–where is venue proper?"–and thus is subject to *de novo* review in the Court of Appeals.  *Gulf Insurance Company v. Glasbrenner*, 417 F.3d 353, 354-355 (2d Cir. 2005) (holding that "venue may

27

properly lie in any judicial district in which significant events or omissions material to the plaintiff's claim have occurred."); *See also Phillips v. Active Audio Ltd.*, 494 F.3d 378 (2d Cir. 2007).

I.      The District Court Erred in Dismissing the Action for Improper Venue Because the Mandamus and Venue Act of 1962 and the Judicial Improvements Act of 1990 Dictate that Venue Is Proper in the Southern District of New York from which Plaintiffs' Underlying Tax Refund Claims Were Filed and to Which the IRS Commissioner Communicated His Unequivocal Refusal to Credit Their Tendered Assets as Tax Payments.

The instant case is not about the Consent Judgment of Forfeiture that was entered into in Flint, Michigan on September 25, 1992. Nor is it about the repeated efforts to have the Consent Judgment set aside, which in retrospect seem unnecessary. For several years there were vexatious litigation practices where the government both refused to identify any factual basis for the forfeiture and opposed setting aside the judgment. Finally this changed after the 2004-2005 review conducted by Deputy Attorney General Comey and Associate Deputy Attorney General Catherine O'Neill where it was acknowledged that violations of the currency structuring law could not have been the reason for the assets being taken and that I.R.S. agents were being truthful when they told Plaintiffs that their

voluntary tender of assets was to pay off their tax liability. *See* Affidavit of John Long dated February 21, 2002, ¶¶ 12-22  (APX 24-29).

Following Associate Deputy Attorney General O'Neill's July 25, 2005 letters to the Chief of IRS Criminal Investigations and the undersigned in which she advised that "the facts underlying the forfeiture and [Plaintiffs'] tax liability are so closely linked," (i.e., the assets were being forfeited to pay off tax liability), the USAO in Eastern Michigan began to acknowledge the validity of tax refund claims but refused to have anything to do with their processing. By August 6, 2008 the government had conceded that the forfeiture was not based on any list of structured transactions, and therefore must have been to pay off tax liability, as per the IRS regulations in force at the time.

For at least the last five years there has been no conceivable reason to reopen any of the issues with regard to the September 25, 1992 Consent Judgment of Forfeiture.  This case is simply about the fact that the IRS collected money for the same tax liability twice and credited it only once.  The ways in which it made its two collections are irrelevant to the issues in this case.  The government's refusals to acknowledge, process or respond to the well-documented refund claims contained in the joint appendix (at APX 1-82) occurred entirely in Washington D.C. and involved no participation by either USAO or IRS personnel in the Eastern

District of Michigan.

    A.    <u>Venue is Proper in the Southern District of New York as well as the</u>
    <u>District of Columbia Because the Mandamus and Venue Act of 1962</u>
    <u>Directs Federal District Courts to Place Primary Emphasis on the</u>
    <u>Convenience of Plaintiffs Filing Mandamus Lawsuits Against Federal</u>
    <u>Officials in Their Official Capacities.</u>

Because all the wrongdoing at issue in this case has occurred in Washington D.C., the serious venue question is whether the instant case can be adjudicated anywhere other than the District of Columbia. Plaintiffs' involvement in the events giving rise to their claims has been exclusively through their attorney, the undersigned, whose participation has primarily been in the Southern District of New York. Plaintiffs maintain that his involvement, primarily at his office in New York City and IRS phone communications to that office communicating unequivocally the Commissioner's refusal to perform his mandatory duty–which is technically what gives rise to a mandamus claim–makes venue proper in the Southern District of New York.

In deeming these activities "too tenuous" to support venue the District Court erred by failing to give credence to the statutory purpose of the 1962 Mandamus and Venue Act that created the pertinent venue statute, 28 U.S.C. § 1391(e). The

30

liberalizing effect of the 1990 amendments that changed both § 1391(e) and §

1391(b) from restricting venue to "where the claim arose" to allowing it in any

district where "a substantial part of the events or omissions giving rise to the claim

occurred" applies with special force to § 1391(e) in light of the Supreme Court's

conclusion that federal officers facing mandamus suits should be prepared to have

them litigated virtually anywhere in the country.  In *Stafford v. Briggs*, 444 U.S.

527 (1980). the Court noted that § 1391(e) expanded choices for venue and, cited

the legislative history of the Mandamus and Venue Act of 1962 as holding that:

> An officer of the Government while so employed may have numerous
> mandamus-type suits naming him or her as a party. Without doubt,
> under § 1391(e), venue lies in every one of the 95 federal districts,
> and suits may be pending in a dozen or several dozen at any one time.
> . . . No personal cost or inconvenience is incurred, either while in
> office or later. It was with this understanding that Congress sought to
> ameliorate the inconvenience and expense to private plaintiffs seeking
> relief from the action or inaction of their Government."

*Stafford*, 444 U.S. at 543-44 (citing H.R. Rep. No. 536, at 3; S. Rep. No. 1992, at

3).  *See also  Pruess v. Udall*, 359 F.2d 615, 618 (D.C. Cir.1965) and Senate

Report No. 1992, 87th Cong., 2d Sess. 3 (1962) stating that the Act's purpose was

"to provide readily available, inexpensive judicial remedies for the citizen who is

aggrieved by the workings of Government". .   Defendants have not contested the

fact the Act's purpose of "**ameliorat[ing] inconvenience and expense to private**

**plaintiffs**" would be best served by having the case adjudicated in the Southern

31

District of New York.  As noted in ¶ 17 of the Amended Complaint:

> Plaintiffs in the instant case do not want this case to be adjudicated in
> the Eastern District of Michigan because they do not want to be
> personally involved in the case and there is no need for them to be
> personally involved.  Their greater need is to reduce litigation costs,
> given their misfortune of having to engage in a long-term war of
> attrition with a larger entity, the Internal Revenue Service.  The
> Southern District of New York is a far better forum for Plaintiffs than
> the Eastern District of Michigan because it will require their counsel
> and Power of Attorney who has been handling the refund claims for
> them to travel less and enable him, and indirectly the clients, to avoid
> paying the cost of hotels.

Nor have Defendants given any reason why adjudicating the matter outside

of Michigan would impose any undue hardship or burden on them.   Indeed, one

would think that they probably would prefer the District of Columbia as their most

convenient forum.  Their memorandum in support of the motion to dismiss for

improper venue at no point pleaded any hardship or reason why they felt the

Eastern District of Michigan would be more convenient. *See Leroy v. Great W*

*United Corp.*, 443 U.S. 173, 183-184 (1979) ("In most instances the purpose of

statutorily defined venue is to protect the defendant against the risk that a plaintiff

will select an unfair or inconvenient place of trial.")   Instead they relied simply on

exaggerating the relevance of past litigation to set aside the consent judgment and

invoking a narrow interpretation of the word "substantial" that was rooted in

§1391(b) before it was amended.

B.   The District Court Erred in Concluding that Venue Was More Proper in the Eastern District of Michigan than in the Southern District of New York for Three Reasons.

1.   The District Court's Reasoning that 28 U.S.C. 1391(e) Favored Venue in Eastern Michigan Because Their Claim Ostensibly Arose There in 1992 Appears to be Based on the Court's Failure to Understand that Since 1990 Federal Courts No Longer Base Decisions about Venue on "Where the Claim Arose."

Although the district court began by identifying the correct legal standard, which is whether "a substantial part of the events or omissions giving rise to the claim occurred," in the district where the action has been brought, 28 U.S.C. §1391(e), its focus shifted when it began to apply the test:

> Conducting that inquiry here, it is plain that venue is improper in the Southern District of New York. The consent judgment into which Plaintiffs entered, and which Plaintiffs contend should be treated as a tax payment, was entered into in the Eastern District of Michigan. . . By contrast, the connections Plaintiffs identify between their claims and the Southern District of New York are far too tenuous to support venue.

Opinion at 5. This language, and especially the district court's sole reliance on a 1982 case, *Birnbaum v. Blum*, suggests that the Court was applying the pre-1990

33

test of determining "where the claim arose" by invoking the no longer appropriate "weight of the contacts" test. The District Court was also going counter to the Second Circuit's rule that "[w]hen material acts or omissions within the forum bear a close nexus to the claims, they are properly deemed 'significant' and, thus, substantial . . ."428 F.3d at 433. The relatively remote event of having entered into a no-longer-contested consent judgment 21 years ago was deemed to have total significance for venue purposes while the immediate triggering events that gave rise to the mandamus claims shortly before suit was filed were deemed "too tenuous to support venue."

In part because neither counsel briefed the issue adequately the district court erred in both respects. First, it relied on the Second Circuit's decision in *Daniel v. Am. Bd. Of Emergency Med.*, 428 F.3d 408, 432 (2d Cir. 2005), but failed to appreciate the significance of the Court of Appeals' ruling on the next page that "[w]hen material acts or omissions within the forum bear a close nexus to the claims, they are properly deemed 'significant' and, thus, substantial . ." 428 F.3d at 433.

Second, by relying on Defendants' use of *Birnbaum v. Blum*, 546 F. Supp. 1363, 1367 (S.D.N.Y. 1982), the Court failed to take cognizance of the significant overhaul of the venue statute that had occurred in 1990 and inadvertently applied

34

the different and, as of 1990, clearly superseded standard for determining "where

the claim arose."   Compare page 5 of the court's opinion (APX 129):

> *See Birnbaum v. Blum*, 546 F. Supp. 1363, 1367 (S.D.N.Y.
> 1982)(concluding that an attorney's location was "no substitute for the
> law's clear mandate that the action may only be tried in the district
> "where all defendants reside, or in which the claim arose.")

with *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004):

> In 1990, § 1391 was amended to make venue proper in any "judicial
> district in which a substantial part of the events or omissions giving
> rise to the claim occurred." [2] Judicial Improvements Act of 1990, Pub.
> L. No. 101-650, § 311(1), 104 Stat. 5089, 5114. Congress amended
> the statute because the prior language "led to wasteful litigation
> whenever several different forums were involved in the transactions
> leading up to the dispute." *Cottman Transmission Sys., Inc. v.
> Martino*, 36 F.3d 291, 294 (3d Cir. 1994) (citing Rep. of the Fed. Cts.
> Study Comm. 94 (Comm. Print 1990)). Under the amended statute, it
> is possible for venue to be proper in more than one judicial district.
> See *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371 (11th Cir.
> 2003). We therefore no longer apply the "weight of the contacts" test.
> See *Ciena Corp. v. Jarrard*, 203 F.3d 312, 318 (4th Cir. 2000)
> (determining venue under amended statute without reference to
> "weight of the contacts" test). . .

> Applying these principles here, we conclude that [the attorney]
> Mitrano's work under the contract constituted "a substantial part of the
> events [and] omissions giving rise to [Mitrano's] claim" for breach of
> contract. 28 U.S.C.A. § 1391(a). Indeed, it was Mitrano's work that
> allegedly created his entitlement to the payment he now seeks. For
> that reason, depending on the amount of work that Mitrano completed
> in the Eastern District, that work alone may be sufficient to justify
> venue there. This conclusion is strongly supported by *Uffner*, which
> concerned a bad faith claim-denial action against an insurer arising
> out of the sinking of a yacht it insured. There, the First Circuit held
> that the sinking of the yacht was a "substantial part of the events or

35

omissions giving rise to the claim" even though the claim did not concern how, when, or why the accident occurred. See *Uffner*, 244 F.3d at 43. The court reached that conclusion because the sinking of the vessel, like Mitrano's performance of the legal services at issue here, was the event that allegedly entitled the plaintiff to the payment sought under the contract. See id. . . Because we reject the analysis of the district court, we vacate the dismissal order and remand for reconsideration of the venue issue.

Once the 1990 amendments went into effect the focus shifted from evaluating the strength of each potential forum's relationship to the controversy to determining whether a given district had any direct connection with it. Almost immediately the Second Circuit determined that section 1391(b)(2) does not restrict venue to the district in which the "most substantial" events or omissions giving rise to a claim occurred. David D. Siegel, "Commentary on the 1988 and 1990 Revisions of Section 1391, Subdivision (a), Clause (2)," printed in 28 U.S.C.A. § 1391 at 9-10 (West 1993) (citing *Bates v. C & S Adjusters, Inc*., 980 F.2d 865, 868 (2d Cir. 1992)). *See also Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 356-357 (2d Cir. 2005) (joining other circuits in "holding that the revised statute 'does not, as a general matter, require the District Court to determine the best venue.'") .

Thus in *Mitrano v. Hawes* the Fourth Circuit, based its decision on where the attorney had done his work and reversed the district court's decision to dismiss the breach of contract action for improper venue even though the contract, its negotiations, breach and much of the work done under it had all been done in a

36

different state.

    2. <u>The District Court Erred Because the Direct Antecedents of Plaintiffs' Claim Occurred Entirely in Washington D.C. and New York City rather than Flint, Michigan, and Controlling Second Circuit Precedents Direct that Decisions about Venue Should Be Based on Direct Antecedents, not Indirect, Historically Remote Ones.</u>

The Court's Opinion (Dkt. 35) began by correctly identifying Plaintiffs' three mandamus claims:

> In this action, John Keith Blakely, Rhonda L. Blakely, and the estates of John E. Long and Virginia E. Long (collectively, "Plaintiffs") seek a writ of mandamus against the Commissioner of the Internal Revenue Service ("IRS") and Secretary of the Treasury (collectively, "Defendants"), pursuant to 28 U.S.C. § 1361. Specifically, Plaintiffs seek a writ directing Defendants to (1) **treat certain assets that Plaintiffs tendered to the IRS in a civil forfeiture action as tax payments**; (2) **address Plaintiffs' claims for a tax refund**; and (3) **divulge the contents of a formal review Plaintiffs claim the IRS conducted regarding their refund claims.** (Am. Compl. ¶ 1 (Docket No. 15))."

Opinion at 1, (APX 127)

The next step should have been to identify very specifically the acts which directly led up to each of these three alleged mandatory duties coming into existence. Significantly, none of these three claimed mandatory duties came into

existence following the consent judgment of forfeiture.   With respect to the second

claim–that under the Internal Revenue Code the IRS has a mandatory duty to

address refund claims in good faith instead of simply losing or hiding them and

making the taxpayer retain counsel and file suit without having any idea of the

Service's grounds for opposition–there is only one thing that CFAS Owners could

do–and did do–to bring about their mandamus claim.  That was to prepare and file

well-documented refund claims.  These were assembled and prepared for mailing

by their counsel, primarily in the Southern District of New York.  For this, the

second mandamus claim, the direct antecedent was the filing of the refund claims,

not the entering into a consent judgment ten years earlier.

　　　The first claim regarding the Commissioner's duty to credit the assets as tax

payments only matured as a claim for writ of mandamus when the Commissioner's

refusal to credit them became clear and unequivocal.  Before that occurred in a

phone call from the Commissioner's or Chief Counsel's representative, Greg

Hoffmaster, the undersigned simply kept having all his correspondence and

attempts to communicate rerouted to the IRS Criminal Investigations Division,

which would then invariably respond that it did not have jurisdiction over refund

claims.   This was irritating but did not give rise a claim for writ of mandamus.

Plaintiffs' entitlement to a writ arose when Hoffmaster communicated

38

unequivocally that the assets would not be credited unless and until Plaintiffs filed an action in court.  Plaintiffs' only connection with that refusal was that it was transmitted to them through their counsel in the Southern District of New York.

   The refusal was not an isolated event.  It was the culmination of multiple written communications and transmissions to Hoffmaster and IRS Chief Counsel William Wilkins that directly concerned documentation of the claim of double taxation and other issues directly relating to Plaintiffs' entitlement to refunds.  These written communications culminated in a six-page letter to Hoffmaster and Wilkins dated February 19, 2013, which led directly to Hoffmaster's telephone response, the gist of which was that Plaintiffs should file a lawsuit, given the seriousness of their claims.  *See* also record of prior communications with Hoffmaster beginning November 28, 2012 at APX 97.  To try to bring the case back to the Eastern District of Michigan and replace the IRS' national leadership, who have been involved in all recent aspects of the dispute, would simply generate confusion and accomplish nothing.

   The third claim–that the IRS has a duty to divulge the contents of the formal review done by Criminal Investigations Division ("CID") Associate Counsel Martin Needle–arose in the following manner: Associate Deputy Attorney General Catherine O'Neil requested that Nancy Jardini, Chief of CID, have their own

review done so IRS and DOJ would have a common understanding about currency

structuring forfeitures. The request was made in Washington D.C. and the review

was conducted in Washington D.C. That claim has no connection with any forum

other than the District of Columbia. When we consider all three claims and list all

the acts done by IRS personnel that gave rise to them, dating back to the 1992-

1993 decision not to credit forfeited assets as tax payments, we find that all were

done by IRS leadership in Washington. None was done by IRS employees in the

Eastern District of Michigan. *See* Amended Complaint, ¶¶ 11-12 (APX 103-104).

As has been noted previously, where events or omissions have a direct

connection with the actual, legal genesis of a plaintiff's claims (e.g., the

Commissioner's communicating his unequivocal refusal to comply with his

mandatory duties of crediting assets as tax payments and allowing refund claims to

be addressed in the normal manner), the event is considered substantial even if

fleeting. *See Daniel v. Am. Bd. Of Emergency Med.*, 428 F.3d 408, 433 (2d Cir.

2005) ("[w]hen material acts or omissions within the forum bear a close nexus to

the claims, they are properly deemed 'significant' and, thus, substantial . .");

*Jenkins Brick Co. v. Bremer*, 321 F.3d at 1372  (11th Cir. 2003) (explaining that

substantiality requirement of § 1391(b)(2) requires consideration only of acts or

omissions that "have a close nexus to the wrong."); *Bates v. C & S Adjusters, Inc*.,

40

980 F.2d 865, 868 (2d Cir. 1992) (holding that plaintiff's mere receipt of a collection notice in the district was a substantial part of the events giving rise to a claim under the Fair Debt Collection Practices Act, even though the company's wrongdoing took place entirely in a different location).  The instant case is virtually on point with *Bates* because the Commissioner's telephone communication to counsel in New York City was the only thing that Plaintiffs received from him, just like the collection notice that the *Bates* plaintiffs received. *See also* extended discussion and citation to other authorities emphasizing importance of directness of connection to claim in *Daniel v. Am. Bd. Of Emergency Med.*, 428 F.3d at 432-434.

        3.      <u>There Do Not Remain Any Contested Legal Issues About the September 25, 1992 Consent Judgment of Forfeiture and Neither IRS Personnel nor Assistant United States Attorneys in Eastern Michigan Want to Have Anything Further to Do with the Litigation of Plaintiffs' Claims.</u>

Some of the most compelling arguments against having this case transferred to the Eastern District of Michigan, or dismissed and refiled there, have actually been made by Assistant United States Attorneys in that district.  Insofar as DOJ attorneys in Michigan have addressed the matter, they have mainly expressed a

preference *for not having the case brought back to them.*  If all courts were to

adhere to the position that the issue of crediting assets as tax payments had to be

adjudicated in the same court where the consent judgment of forfeiture was

entered, that would mean bringing the case back to AUSA-in-charge Robert W.

Haviland, who is due to retire soon.   But here is Haviland's position:

> AUSA Haviland when questioned during the last several days
> confirmed that no one had contacted him about the instant case being
> transferred to his district and stressed that he had consistently taken
> the position that he was unwilling to be involved in any litigation
> regarding Plaintiffs' tax refund claims and continues to take that
> position.

Amended Complaint, ¶ 18 at APX 106-107.  AUSA William Woodard, who

represented the government in the case which determined that tax refund claims

were the appropriate vehicle of redress for Plaintiffs and may now also be retired,

likewise has expressed a preference that the instant case not be transferred back to

the United States Attorney's Detroit office.  He raises the argument that unlike the

Southern District of New York, the Eastern District of Michigan USAO does not

have a tax and bankruptcy division and that they generally turn to attorneys in

Washington D.C. to advise them on IRS-related matters.  *Id.*

Especially since there is no overlap of legal questions between the prior

litigation regarding setting aside the consent judgment of forfeiture and the current

litigation which concerns the mandatory nature of the Internal Revenue Code when

there is a Commissioner who does not want to apply some of its provisions, there is

no reason why Haviland, Woodard or any other attorney in the Eastern District of

Michigan should be conscripted into again having to represent federal defendants

in this matter.  In addition, there are presently no available judicial personnel in the

Eastern District of Michigan with experience in the forfeiture litigation.  The

original trial judge, the Hon. Stewart A. Newblatt, retired in or about 1998, shortly

after vacating the erroneously imposed currency structuring convictions.  His

successor, the Hon. Paul V. Gadola, was forced to retire because of Alzheimer's

disease about twelve years later.  *Id.* at 107.  In addition paragraphs 20-21 of the

amended complaint, APX 107-108, describe a particularly tense situation that has

arisen with IRS agents in the Flint area, who seem to view Plaintiffs' refund claims

as a possible linchpin of disciplinary action being taken against them.

II.     In Light of the Extensive Delays and Recurring Abuse of the Court System

Exhibited in this Now Twenty Year-Old Dispute, the Court of Appeals

Should Exercise Its Discretion to Discourage Official Flouting of the Law

and Bring the Matter to a Lawful Resolution.

There is no secret about what a lawful resolution would entail.  Since the

United States has already conceded that the Consent Judgment of Forfeiture was

not based on "currency structuring" when Plaintiffs deposited their bags of small

bills from Country Folk Art Shows gate receipts in local banks, the only other possible interpretation is that the assets were tendered to pay off their tax liability. This means that the IRS has an obligation to credit the assets as tax payments and then address Plaintiffs' entitlement to a tax refund lawfully by applying the rules set forth in the Internal Revenue Code. Regardless of the position taken by the IRS in ruling on tax refund claims, their actions will look better than they do at present where its leadership is in the uncomfortable position of taking tax payments, distributing them to agents, making the taxpayers pay a second time, and then either losing or hiding their well-documented refund claims. This shabby appearance is then made worse by Defendants trying to go back to the Sixth Circuit and undo the concessions made by the United States in 2008.

The instant case will not fully resolve the underlying dispute, but it can at least put the parties on a path toward complying with the law. If the IRS has any legitimate grounds for reducing the amount of refunds owed, it can present them in its handling of the refund claims, which would conceivably necessitate further litigation under 26 U.S.C. § 7422(a). This is a better, less arrogant, and less brazenly lawless way of resolving the underlying dispute. But strangely the lofty goal of getting the Internal Revenue Service to comply with the Internal Revenue Code seems to be beyond reach. It is kept beyond reach by a combination of IRS

44

attorneys arguing–perhaps plausibly–that mere acquisition of a taxpayer's money by IRS agents does not automatically constitute a tax payment unless the Commissioner writes a letter saying that it does, and the Commissioner refusing to write the letter.  This conundrum, rather than anything in a 1992 Consent Judgment of Forfeiture, is precisely what has given rise to this lawsuit.

There are three ways that the Court of Appeals can help to remove this ugly stain from the jurisprudential landscape of the United States.  One can be done regardless of how the Court rules on the central legal question of venue under §1391(e).  This is simply to express in dicta a preference for lawfully accrued monies voluntarily tendered to the IRS being promptly credited as tax payments unless there is some compelling reason otherwise.  It is possible that the moral authority of three judges on the Court of Appeals being willing to say this might ease the situation even without further litigation.

The other two ways depend on whether the case is being reversed and remanded or the District Court's conclusion of improper venue is being affirmed.  Admittedly Plaintiffs' case for proper venue would be more overwhelmingly strong in the District of Columbia than it is in the Southern District of New York.  By contrast, the argument for venue in Eastern Michigan based on the remote antecedent of a 1992 Consent Judgment which delivered the first of two redundant

45

tax payments is considerably weaker than the argument for venue in either of the other two districts.  If venue is not proper in the Southern District, then we should at least try not to have this litigation be a complete waste of time.  The Court of Appeals can at least prevent future litigation over venue in other courts by declaring venue clearly proper in the District of Columbia and transferring the case under 28 U.S.C. § 1406 (a) to that district.  Logically this can be done either by ruling that the district judge abused his discretion in not granting Plaintiffs' motion to transfer the case to the District of Columbia, or by stating that in a case where no live testimony has been taken discretion may properly reside in appellate panels as well as district judges.   Given the inherent inefficiency of having to redo everything previously done (e.g., somewhat complicated service of process requirements), courts often favor transfer pursuant to 28 U.S.C. §1406(a) over dismissal.  Appellate courts will sometimes remand for this reason even when an initial determination of improper venue is being affirmed.  *See, e.g., O'Neal v. Hicks Brokerage Co.*, 537 F.2d 1266 (4th Cir. 1976); *Amerio Contact Plate Freezers v. Knowles,* 274 F.2d 590 (D.C. Cir. 1960); *Orion Shipping & Trading Co. v.United States*, 247 F.2d 755 (9th Cir. 1957).

If the case is being reversed and remanded, then the panel should consider giving a nod to two motions made by Plaintiffs that were summarily rejected by the

District Court.  One was to refer the matter to mediation so the parties could at least begin talking with one another about their positions on the merits.  If Defendants continue to have an intransigent attitude, then they should be ordered to answer the complaint and Plaintiffs should be allowed to move for summary judgment on their three mandamus claims.

Likewise, the District Court made some important factual errors in its opinion granting Defendants' motion to dismiss.  These could become a source of future antagonism and embarrassment if the IRS tries to rely on them in the future under circumstances where Plaintiffs can easily prove they are wrong.  The errors included stating that the Department of Justice denied Plaintiffs' tax refund claims. In reality the Department of Justice has no jurisdiction over tax refund claims, and insofar as it tried to influence the IRS, its attempts, at least in the Deputy Attorney General's office, were to try to get the IRS to rule on the claims.  Errors also included casting unfair aspersions on Plaintiffs' counsel and implying that the Sixth Circuit's refusal to set aside the consent judgment of forfeiture meant that money was simply being donated to the IRS with no effect on tax liability.  That conclusion is starkly at odds with the Sixth Circuit's Order of August 6, 2008. These errors were brought to the district judge's attention in Plaintiffs' Rule 60(b)(1) motion (Dkt. 37,  APX 133-137), but Defendants took the position that

47

because they did not affect the holding, it would be improper to correct them.   The

district court sustained that position *sub silentio* by denying the motion without

opinion.

## Conclusion

The issue of venue in the Southern District of New York conceivably could

be one upon which reasonable minds can differ, but recent trends and Court of

Appeals decisions point toward a liberal approach of construing the term

"substantial" in a way that respects Plaintiffs' choice of forum as long as it has

been chosen for legitimate reasons.  Legitimate reasons in this case include both

cost savings for Plaintiffs and the fact that Plaintiffs' only degree of involvement in

the specific decisions and communications that directly have given rise to their

claims has been through their attorney, whose pertinent actions have been

primarily in the Southern District of New York.  Plaintiffs contend that the district

court's decision to dismiss pursuant to Rule 12(b)(3) should be reversed because

the most clearly correct ruling would be to set aside the dismissal and find venue

proper based on a combination of the 1990 amendments to 28 U.S.C. § 1391, the

statutory purpose of the Mandamus and Venue Act of 1962 that created § 1391(e),

and Plaintiffs' decision to economize and immunize themselves from extended

frustration by having the undersigned handle their tax refund claims, largely from

48

his office in New York City.

But regardless of the ruling on that central issue, the Court should do what it can to expedite fair and lawful resolution of this matter. Some of the ways it can do so are detailed in Point II, *supra*.

Respectfully Yours,

/s/ Jeffrey M. Blum

Jeffrey M. Blum
Counsel for Appellants
1 Stuyvesant Oval 8D
New York, New York 10009
Phone (502) 494-2889
Email  blum.jm@gmail.com
       jmblum@hotmail.com

**Certificate of Compliance pursuant to Rule 32(a)(7)(C), Fed. R. App. Proc.**

This is to certify that the above brief is comprised of exactly 11,524 words, according to the word processing program, Word Perfect X4, which includes every printed word except for the Table of Contents, Table of Citation and Authorities, Cover, certificate of service and this certificate of compliance.

/s/ Jeffrey M. Blum

Jeffrey M. Blum

Certificate of Service

It is hereby certified that on July 31, 2014 a true and correct copy of the foregoing was mailed electronically through the ECF system of the United States

Court of Appeals for the Second Circuit to the electronic addresses as set forth in the ECF system to all other persons receiving electronic notifications in this case.

/s/ Jeffrey M. Blum